Cincinnati Stamping Company v. Commissioner.
Cincinnati Stamping Co. v. Commissioner
Docket No. 4620.
United States Tax Court
1945 Tax Ct. Memo LEXIS 114; 4 T.C.M. (CCH) 806; T.C.M. (RIA) 45258; July 25, 1945
*114 Henry A. Kalcheim, Esq., 180 West Washington St., Chicago, Ill., Thomas L. Tallentire, Esq., and Edward R. Dorr, Esq. for the petitioner. W. W. Kerr, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: Respondent has determined deficiencies as follows: Declared
Value
Excess-
Income
Excess-
Profits
Year
Tax
Profits Tax
Tax
Aug. 1, 1940 to
Dec. 31,
1940
$10,169.96
$ 8,860.43
1941
8,146.73
$7,458.59
18,598.75
The deficiencies arise through respondent's determination that petitioner is an association taxable as a corporation under section 3797, I.R.C. Petitioner contends that it is a pure partnership and not an association. Findings of Fact Petitioner is a business organized under a contract designated as a "Partnership Agreement" executed August 1, 1940 by 5 individuals. During the period here involved it carried on a metal stamping and fabricating business at 28 West McMicken Avenue, Cincinnati, Ohio, which had formerly been operated at that location by a corporation. Its returns for the taxable periods were filed with the collector of internal revenue *115 for the first district of Ohio, at Cincinati, Ohio. The Cincinnati Stamping Co., a corporation, was organized in 1882 and following that was engaged in the fabrication of sheet metal parts until the beginning of the period here involved. In 1940, at the time of the transactions hereinafter detailed, practically all of its outstanding stock was owned by 5 individuals and by family trusts of certain of these individuals. These individuals, Ralph E. Grimme, George A. Wimmer, John G. Schroer, William P. Eger, and Albert Hoersting, were officers and/or directors of the corporation. Ralph E. Grimme had been secretary and treasurer since 1932. On August 1, 1940, the above-named individuals and Eleanor Sherman executed a contract designated "Partnership Agreement", which provided for the carrying on of business under the name "Cincinnati Stamping Company". Ralph E. Grimme, William P. Eger, Albert Hoersting and Eleanor Sherman executed the instrument as "Trustee" without designating the trust for which they respectively acted. George A. Wimmer and John G. Schroer executed the instrument as individuals. The "Partnership Agreement" provided, inter alia, that the investments of the partners *116 be $100 each, Albert Hoersting and Eleanor Sherman being treated as joint trustees with a 1/5 interest and making a joint contribution of $100. The contract further provides: "5. It is further agreed that Ralph E. Grimme will give the business his entire personal attention that he will conduct and manage said business as General Manager. It is further agreed that the said Ralph E. Grimme, as such manager, shall have the right to determine the value of any services, if any, which shall be rendered to the Partnership by himself and any and all of the partners and that such determination of such value shall be final and controlling for the duration of this Partnership. "It is further agreed that Ralph E. Grimme shall have the right to name his successor as such General Manager at any time during his lifetime or that he may designate such successor by Will. "6. The rent of the buildings where the said business shall be carried on, the cost of repairs and all other charges, and the wages of all persons employed in the said Partnership business, and all other monies to be payable on account of the said business, and all losses which shall happen in the same, shall be paid out of the *117 capital of the partnership and the profits arising therefrom. * * * * *
"All net profits remaining after distribution, as above set forth, shall be equally divided among all of the partners, but the time and manner of such distribution shall be at the sole discretion and with the approval of the General Manager. * * * * *
"8. No partner shall enter into any obligations whatsoever on behalf of the Partnership, without the consent and approval of the General Manager. "9. In the event that any partner should disagree with the remaining partners on matters pertaining to the conduct of the Partnership business, and such disagreement should cause a disturbance which interferes with the conduct of said Partnership business, the remaining partners shall have the option to purchase the interest of said disagreeing partner by paying to such partner Fifty (50") Cents for each One Dollar ($1.00) interest of such disagreeing partner in the Partnership business. In the event that any partner should cause a disagreement, through his own act, which shall cause the dissolution of the Partnership by due process of law, such partner shall receive Twenty Five (25") Cents for each One *118 Dollar ($1.00) interest in the said Partnership, as determined by Book Value thereof. "10. No partner shall, without the written consent in writing of the other partners, enter into any bond or become bail or security for any person, or do or willingly suffer to be done, anything whereby the capital or property of the Partnership, or his separate interest therein, may be attached or taken in execution. "11. Each partner shall punctually pay his separate debts, and indemnify the other partners, and the capital and property of the partnership, against the same and all expenses on account thereof. "12. Books of account shall be kept by the General Manager and proper entries made therein of all sales, purchases, receipts, payments, engagements, transactions and property of the Partnership; and the said books of account and all securities, papers and writings of the partnership shail be kept at the place of business of the Partnership, and such books shall be open for inspection by the partners only at such time and place as the General Manager shall designate. * * * * *
"16. All money received by said partners, or any of them, for the said Partnership, or in any way coming *119 thereto, shall be accounted for to the General Manager. All debts and obligations of said Partnership shall be paid by check on said bank account or accounts, which checks shall be signed by the General Manager, except direct cash and petty cash disbursements, or occasional checks necessary as a result of General Manager's absence. "17. The General Manager is hereby vested with full power to make all purchases, contract for all sales, establish all prices and to fully determine the policy of the Partnership in all matters pertaining to the Partnership business. "18. It is mutually agreed and covenanted that no changes, alterations, additions, modifications or qualifications shall be made or had in the terms of provisions of any article or articles of this agreement unless the same shall be made in writing signed by all of the parties to this agreement." On the same day that the aforesaid "Partnership Agreement" was executed, August 1, 1940, Agnes Grimme, wife of Ralph E. Grimme, executed a trust naming him as trustee. The corpus of the trust was $100. The trustee was authorized to "manage and control such sum, or any and all investments or interests purchased with the same, and *120 shall have full power as such Trustee, to enter into associations, partnerships, firms and other business ventures * * *". The designated beneficiaries of the trust were the children of the settlor and trustee. The trust instrument provided that the trustee for his services as such was to receive compensation of $5,000 per year which was to be a first charge upon the income of the trust. On the same day a similar trust agreement was executed by Erma C. Eger, wife of William P. Eger, appointing the latter as trustee and with their children as beneficiaries. As in the case of the Grimme trust, the corpus was $100 but the compensation to be paid the trustee was set at $4,000 per annum. On August 20, 1940, approximately 3 weeks subsequent to the execution of the "Partnership Agreement" hereinbefore described by Albert Hoersting and Eleanor Sherman as trustees, these 2 parties as individuals, together with 6 members of their family, executed a trust designated as the "Hoersting Family Trust". Albert Hoersting and Eleanor Sherman, who is his sister, were designated as trustees. The instrument evidenced the transfer to the trustees, as corpus of the trust, of certain stocks, including 273 *121 shares of stock of The Cincinnati Stamping Co., certain real estate, and "a one fifth interest in Cincinnati Stamping Co., a partnership". By which settlor or settlors the transfer of the "partnership interest" was made, is not disclosed. The 8 settlors were to participate equally in the income of the trust. On August 5, 1940, 5 days after the execution of the "Partnership Agreement", John G. Schroer executed a trust instrument designating Ralph E. Grimme as trustee. The instrument evidences the transfer to the trustee, as corpus of the trust, of 300 shares of stock of The Cincinnati Stamping Company and "partnership interest in Cincinnati Stamping Co." The beneficiaries of the trust were the settlor and his wife. The settlor by the indenture was designated as "Trust Manager" and was given complete control of trust corpus and income. Prior to the execution of the aforesaid "Partnership Agreement" the 5 individuals, Grimme, Wimmer, Schroer, Eger and Hoersting, as officers and holders of the stock of The Cincinnati Stamping Co., caused that company to agree to the transfer of its assets and business to a partnership to be organized by them. The consideration to be paid was $80,000 *122 in 25-year debenture bonds of the partnership, plus $6,955.44, which was the book value of inventory and accounts receivable, together with the assumption of the corporate indebtedness. The partnership was to receive the accounts receivable and inventory of the corporation and the right to use the name, Cincinnati Stamping Co. It was to assume the lease of the corporation on its business property and have the use of the machinery and equipment at a yearly rental of $3,000, with an option to buy. This contract was carried out. After the execution of the "Partnership Agreement" the business continued to be carried on without interruption at the same location, with the same assets and under the management and direction of the same individuals. The banks, the customers and the credit and other agencies were notified that the business was now a partnership. On the stationery and billheads the word "The" was blacked out leaving the title to read "Cincinnati Stamping Co." Similarly, the sign on the building was changed by painting out the word "The". On August 1, 1940 the "Partnership" executed a trust indenture to secure an authorized issue of $120,000 in 25-year income debenture bonds. *123 This was signed by the parties executing the "Partnership Agreement". This indenture provided that the bonds to be issued would not constitute a personal liability of the partners but were enforceable only against partnership assets. Of the $120,000 in debenture bonds authorized, $80,000 were issued. These were signed by the same individuals and acting in the same capacity as in their execution of the "Partnership Agreement". No new trust indenture was executed during the period here involved. Following the execution of the "Partnership Agreement", Ralph E. Grimme, on August 19, 1940, entered into a contract with William P. Eger, Trustee, under which he was given the right upon the death of Eger to purchase the partnership interest in the petitioner which he held in trust, for a consideration representing the actual investment of the trust in such interest. Similar contracts were executed by Grimme with Schroer and Wimmer for the acquisition of their interests on the same basis upon their deaths. In February 1942 Eger died and under his agreement with him Grimme acquired his interest, the other 3 members of the partnership contributing with him equal portions of its purchase price, *124 thus leaving the 4 remaining members owning equal interests in the business. In 1944 the Schroer interest was acquired by the 3 other members and at that time a new partnership contract was executed. Opinion The contested deficiencies arise through respondent's determination that the business of petitioner from August 1, 1940 to the close of the following year was carried on as an association and consequently for tax purposes to be treated as a corporation and taxed as such. Sec. 3797 (a) (3), I.R.C.
The test as to whether an organization constitutes an association taxable as a corporation is well defined. In the case of Morrissey v. Commissioner, 296 U.S. 344, a complete analysis of the question is made and the factors of corporate resemblance which justify the classification of the organization as an association determined. There the court said: The inclusion of associations with corporations implies resemblance; but it is resemblance and not identity. The resemblance points to features distinguishing associations from partnerships as well as from ordinary trusts. As we have seen, the classification cannot be said to require organization *125 under a statute, or with statutory privileges. The term embraces associations as they may exist at common law. Hecht v. Malley, supra. We have already referred to the definitions, quoted in that case, showing the ordinary meaning of the term as applicable to a body of persons united without a charter "but upon the methods and forms used by incorporated bodies for the prosecution of some common enterprise." These definitions, while helpful, are not to be pressed so far as to make mere formal procedure a controlling test. The provision itself negatives such a construction. Thus unincorporated joint-stock companies have generally been regarded as bearing the closest resemblance to corporations. But, in the Revenue Acts, associations are mentioned separately and are not to be treated as limited to "joint-stock companies," although belonging to the same group. While the use of corporate forms may furnish persuasive evidence of the existence of an association, the absence of particular forms, or of the usual terminology of corporations, cannot be regarded as decisive. Thus an association may not have "directors" or "officers," but the "trustees" may function "in much the same manner as the *126 directors in a corporation" for the purpose of carrying on the enterprise. The regulatory provisions of the trust instrument may take the place of "by-laws." And as there may be, under the reasoning in the Hecht Case, an absence of control by beneficiaries such as is commonly exercised by stockholders in a business corporation, it cannot be considered to be essential to the existence of an association that those beneficially interested should hold meetings or elect their representatives. Again, while the faculty of transferring the interests of members without affecting the continuity of the enterprise may be deemed to be characteristic, the test of an association is not to be found in the mere formal evidence of interests or in a particular method of transfer. Applying the reasoning of this opinion to the present organization constituted by the "Partnership Agreement" of August 1, 1940, and taking into consideration the trust indenture of that date, the debenture bonds issued thereunder and the collateral agreements covering the transfer of individual interests, we think it is clear that corporate resemblance is sufficient to stamp it as an association. The business had been operated *127 for many years as a corporation. In its new costume of "partnership" we see little change. A reading of the "Partnership Agreement" leaves no doubt that it definitely provided for - in fact attempted to guarantee - centralized control as well as continued and uninterrupted operation. Grimme is designated as general manager for life with power to designate his successor. As general manager he is given absolute control of operations. The other so-called "partners" have no voice in the management. The liquidation of the partnership business and distribution of its property can not be forced by any partner since the agreement provides in such case that his interest may be liquidated at 1/4 of its book value. The investment of the so-called "partners" in the business is nominal, $100 each. However, the real and genuine investment is represented by the $80,000 in 25-year debenture bonds of the partnership issued to the corporation for its assets and distributed to its stockholders who are, basically, the same interests which own the partnership. These bonds are transferable and, although partnership obligations, it is specifically provided that they shall be enforceable only against partnership *128 assets. The "partners" have no personal liability thereon. By this limitation a condition typical of corporate liability, but absent in a real partnership, is created. To absolutely assure continued, uninterrupted conduct of the enterprise in case of the death of a "partner," collateral agreements were executed which entitled the general manager, Grimme, to acquire the interest of a deceased partner at its actual cost, and in the case of one partner who has died, such interest was acquired by and transferred to the remaining partners. In contending that it is a pure partnership and must be so considered, petitioner, however, insists that there is one feature of its operation which can be reconciled only with partnership status. This is a complete lack of centralized control and management. It is argued that under the partnership agreement in effect during the taxable period, the partners had equal voice in the management of its affairs and exercised that right. The basis of that argument is that 5 days after the partnership was organized on August 1, 1940, it was dissolved and a new partnership created by a verbal agreement under which it operated during the taxable period. The *129 terms of this verbal agreement are utterly at variance with the express conditions of the formal written "Partnership Agreement" executed August 1, 1940. Thus Grimme, Schroer and Hoersting all testify that on August 5, 1940 Schroer, who had signed the partnership agreement as an individual, decided to withdraw as such and to trustee his interest and re-enter the partnership as trust manager and that, the others having no objection, the partnership created by the written agreement was that day terminated and then re-created under a "verbal contract" of an entirely different character from that carefully drafted, put in writing and formally executed 5 days previously. Under the "verbal contract" it is said Grimme was stripped of his authority to control and manage the affairs of the business and it was agreed, instead, that his title of "General Manager" would be merely honorary and that the business should be managed and directed by all 5 partners, each having equal authority. These 3 witnesses testify that following the execution of this "verbal contract" the 5 partners did exercise equal authority. Upon this evidence we are asked by petitioner to find as a fact that such "verbal contract" *130 was so executed. Petitioner's counsel, upon brief, contends that it has been so established by "uncontroverted testimony." In the first place, assuming that this fact was established by the record, we do not agree with petitioner that such fact would compel the conclusion that there was no centralized control. Such control does not necessarily mean direction and management vested in a single individual. Morrissey v. Commissioner, supra.In the second place, we have not and can not find the fact requested. We do not agree with counsel for petitioner that the evidence of it, consisting of the testimony of the 3 witnesses, is "uncontroverted." The reasonable implications from other evidence controvert that testimony. This contradiction is convincing. It is most unusual, to say the least, for prudent business men embarking in a substantial business representing a considerable investment, to do so under a mere verbal agreement of partnership. That these individuals did not do such things in that way is shown by the carefully prepared formal contract which they had caused to be drafted by an attorney and had executed with all due formality only 5 days previously and which *131 provided: 18. It is mutually agreed and covenanted that no changes, alterations, additions, modifications or qualifications shall be made or had in the terms of provisions of any article or articles of this agreement unless the same shall be made in writing signed by all of the parties to this agreement. The record further shows that some months after the time when the "verbal contract" is said to have been executed, a revenue agent, in his examination of the affairs of the business, requested a copy of the partnership agreement. Grimme gave him a copy of the contract of August 1, 1940 with his own attestation endorsed thereon and sworn to, reading "I hereby certify that this is a true and exact copy of the Partnership Agreement." Grimme attempted to explain his failure to advise the agent about the verbal agreement by saying that the agent had not asked about it. That explanation is wholly unsatisfactory. Moreover, on September 8, 1942, not only Grimme and the 2 other witnesses whose testimony we are asked to believe, but also George A. Wimmer and Eleanor Sherman, in a protest filed with the Treasury in connection with a matter of the corporation "The Cincinnati Stamping Co. *132 " and involving the question of the transfer of the corporate business to the "partnership," made statements under oath which can not be reconciled with the testimony here of the 3 named witnesses. In this protest it is repeatedly stated that Ralph E. Grimme has complete control of the partnership business. At one place it is stated: * * * Under the partnership agreement Mr. Grimme was appointed general manager for the remainder of his life, with a right to appoint his successor. * * * The salaries of the employes of the partnership are under the exclusive control of Mr. Grimme. Also, under the partnership agreement Mr. Grimme has authority to distribute partnership earnings according to his own best judgment. * * * Under these conditions we can not accept the testimony of the 3 witnesses as establishing the fact that the conditions of the August 1st contract were in effect for only 5 days. The clear weight of the evidence is that the business was carried on after August 1, 1940 and during the taxable period with the rights, privileges and duties of the several partners fixed by the written contract of that date. The fact that there might have been technical dissolutions of the *133 partnership on August 5 and again on the death of Eger has no bearing on the pending question. In any event the partnership, as created by the written contract, was immediately reconstituted and the business carried on without break in its continuity or change in its control or method of operation. A case similar on its facts in many respects is Poplar Bluff Printing Co. v. Commissioner, 149 Fed. (2d) 1016 (C.C.A., 8th Cir., June 20, 1945), affirming our decision in Memorandum Opinion entered July 22, 1944. There the business was formerly owned and operated by a corporation. This was dissolved and the assets conveyed by the stockholders to a partnership in which they held interests proportionate to their interests in the former corporation. The business was carried on with the same assets and the management centralized in the chief stockholder. The latter was given the right to purchase the share of any participant who desired to dispose of it. In affirming our decision holding the partnership to be an association taxable as a corporation, the court said: In an ordinary co-partnership each partner represents his fellows, and within the scope of the common enterprise *134 may by his acts impose liability upon them. When, however, the associates so organize themselves that no representative action may normally be taken except by elected officials, the association has taken on qualities of a corporation, as distinguished from a co-partnership. Under the agreement here considered, the individual associate did not represent his fellows and it was not contemplated that his acts would impose liability upon his associates. This could only be done by the managing executive. It is our conclusion that the petitioner was, during the period here involved, an association within the meaning of section 3797, Internal Revenue Code, and therefore taxable as a corporation. Section 3797 (a) (3), I.R.C.
Decision will be entered for the respondent.